Filed 1/27/15  P. v. Streeter CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DONALD STREETER, <br><br> Defendant and Appellant. | B251128 <br><br> (Los Angeles County <br> Super. Ct. No. BA386212) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Elaine F. Tumonis, Deputy Attorneys General, for Plaintiff and Respondent.

Donald Streeter was charged with murder (Pen. Code, § 187, subd. (a); all further statutory citations are to this code) with enhancements for personal use of a handgun (§ 12022.53, subds. (b), (c), & (d)) and for a crime committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). He moved to suppress admissions he had made during police interrogation. After that motion was denied, he accepted the prosecution's offer in a plea bargain. Pursuant to the plea agreement he pleaded no contest to voluntary manslaughter (§ 192, subd. (a)), with the same enhancement allegations. Shortly after entering his plea, he discharged his retained attorney, asked for the appointment of new counsel, and moved to withdraw the plea. Following briefing and a hearing at which testimony was taken, and argument presented, the trial court denied the motion. Defendant appeals from his conviction, arguing the trial court erred in denying his motion to withdraw the plea. We find no error and affirm the conviction.

## FACTUAL AND PROCEDURAL SUMMARY

Understandably, since there was a disposition without trial in this case, no issue is raised with respect to sufficiency of the evidence. We therefore present the following brief summary of the underlying evidence, taken from the transcript of the felony preliminary hearing and defendant's admissions in interrogation. In the late hours of November 13, 2010, or the early morning of the next day, there was a shooting at or near the intersection of 46th Street and Central Avenue in Los Angeles. The apparent targets were members of defendant's gang, the 4-Deuce. Later that evening defendant was asked to participate in a retaliatory attack on a location where members of the gang responsible for the shooting were thought to be. They were in the area of the Bottoms Up Club on 50th Street and Central Avenue. He was handed a gun and told to shoot persons at the location, and was threatened with expulsion from his gang if he refused. Defendant was a passenger in one of two cars that drove to the location and, on arriving, fired several shots through an open window on the passenger side of the vehicle. In doing so, he shot and killed Stephanie Thompson, a young woman who was standing at the location. Later, in interrogation, he expressed regret for the killing and said he had been forced to

2

do it.  Defendant was 18 years old at the time of these crimes.

The interrogation was conducted by two detectives who had asked defendant to accompany them to the police station; he agreed to do so.  At an encounter about a week before, defendant had told officers that he knew about the shooting, named two persons (not himself) as being responsible or having information about it, and said he would try to get more information.  At the police station the officers read defendant a *Miranda* admonition about his right to remain silent and to have an attorney present during questioning.  (*Miranda v. Arizona* (1966) 384 U.S. 436.)  Defendant waived those rights, both orally and by signing a waiver form, and agreed to discuss the matter with the officers.  He initially pointed to others as responsible for the shooting, but eventually confessed that he was the shooter who killed Ms. Thompson.  At trial, defendant moved to suppress evidence of the statements he made to the officers.  The basis of his motion was that he suffered from cognitive limitations that prevented him from understanding the rights he was giving up.  Much of defendant's opening brief is devoted to that issue, but the trial court's denial of his motion to suppress is not raised as a ground of appeal. Nor could it be in light of the negotiated disposition of the case, even though a certificate of probable cause was granted by the trial court.  (§ 1237.5; see *People v. Johnson* (2009) 47 Cal.4th 668, 679.)  The only pertinence of the suppression proceedings is that evidence of defendant's cognitive limitations, developed at that phase of the case, bears on his motion to withdraw the no contest plea.  We address this in our discussion of that issue.

The parties had been discussing a possible disposition of the case for some time before reaching agreement.  Jury selection was still in progress when, on April 11, 2013, the court stated its understanding that the parties had agreed on a disposition. Immediately after that announcement, defendant interjected, "Can I sign it today?  I don't want to come back to court no more."  His attorney explained that defendant "wants to have this over today, Your Honor.  In other words, he wants to be sentenced today as well."  The court then explained the procedure it would follow in taking the plea.  The prosecutor set out the People's offer:  defendant would plead guilty to voluntary

manslaughter, under a new count to be added as Count 2, and would be sentenced to state prison for 11 years for that crime. He also would admit the special allegation of firearm use under section 12022.5 subdivision (a), for which an additional term of four years would be added, and would admit the gang allegation under section 186.22 subdivision (b)(1)(C), which would add 10 years to the sentence, for a total of 25 years, less credit for time already served. The People would dismiss the murder charge and other allegations then pending. The court asked defendant if this is what he understood the agreement to be, and he replied "Yes, ma'am," indicating that it was. The information was then amended in accordance with the prosecutor's statement. The court observed that there had been some discussion about the facility where defendant would be placed in the prison system. The court stated that it could not order a particular placement, but would recommend that prison authorities evaluate defendant for incarceration at a location where he would receive treatment if necessary. Defendant acknowledged that he understood.

The court proceeded with the taking of the waivers and plea. In response to the court's question whether he had discussed the charges with his attorney, defendant asked, "What do you mean?" The court repeated and explained its question, and defendant then answered in the affirmative. The prosecutor asked defendant if he understood the sentence he could receive was in state prison, that this was only because of his plea to the lesser crime (voluntary manslaughter), and that if he were convicted of first degree murder with the other allegations he would be exposed to a sentence of 50 years to life. Defendant said he understood this. The prosecutor then reviewed the specific rights defendant was giving up and defendant said that he understood. When the prosecutor reached the right to confront witnesses and present defenses and asked defendant if he understood that right, defendant responded, "What does she got? I don't understand." The prosecutor restated these rights and defendant then said he understood, and waived them. He also acknowledged understanding of and waived the remaining rights. The court then reached the fees and assessments it was required to impose, and defendant acknowledged that he understood. Defendant acknowledged that no one had threatened

4

him or anyone near to him in order to make him enter the plea, and that he was entering it of his own free will and that is what he wanted to do.  There was a pause while defendant discussed what "consequences" of his plea meant, then he stated that he understood.  He also said he did not need more time with respect to the plea.  He then entered the plea—no contest—and admitted the firearm use and gang allegations.

There apparently had been a request that members of the decedent's family be present for the sentencing, and the court stated that it would handle that in the afternoon.  The court excused the jurors.

At the afternoon session, after the court asked defense counsel for her calculation of defendant's credit entitlement and asked if there was anything else, defendant stated, "Yes, Judge.  I want to take my plea back, ma'am.  I need to let the people know.  I need more time to think.  And my lawyer knows about this case."  The prosecutor was surprised, and the court stated that it had not heard a legal basis to withdraw the plea.  The prosecutor indicated that he would prepare a brief for the court that day, which he did.

The next day, when the case was called, defense counsel stated that defendant had asked that she be removed as his attorney.  Asked whether this was a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118), she explained that it was not, and that defendant was "firing me."  Defendant acknowledged this was "correct."  The court granted his motion to relieve retained counsel and asked the indigent defense panel to select an attorney.  At the next hearing a member of that panel, Jack Fuller, was appointed to take over defendant's representation, and the matter was continued for sentencing.

Defendant's formal motion to withdraw the plea was filed on July 2, 2013.  It was based on two grounds:  "That defendant believed that he would have a right to appeal the denial of his motion to suppress evidence of his statement [to police] and he has now learned that such an order cannot be appealed" and ineffective representation by counsel "in that the defendant was not advised that he would not have a right to appeal the denial of his motion to suppress his statement."  The motion was supported by defendant's

5

declaration that when he entered the plea he was "given the impression that [he] would be permitted to appeal the denial of [his] motion to suppress [his] statement" and that he "later learned that this is a non-appealable order and that [he] will have no recourse to challenge the court's ruling" on the motion. Defendant also stated that if he had been advised that he could not appeal the order denying his motion he would have demanded his right to jury trial, and that he now wishes to withdraw the plea and reinstate his not guilty plea to the murder charge.

The prosecutor objected to defendant's declaration as evidence of the factual assertions it made, and argued that if defendant wishes to present evidence on what he thought and why he acted in a particular way, he would have to testify and be subject to cross-examination. His new counsel agreed that defendant would testify "specifically and only to the issue of whether or not he was advised that he would or would not be able to have appellate rights as to the issue of the denial of the motion to keep his statement."

In his ensuing testimony defendant's attorney asked whether defendant was told by his previous attorney that the statements made to police at the time of his arrest would be heard by the jury. He responded that "she [the attorney] never told me none of that." Asked whether he decided to plead guilty because the judge had ruled the statements would be heard by the jury, he answered in the affirmative. He was next asked whether he understood he "would be able to appeal the judge's ruling, that is to have another court decide whether or not the judge was right in ruling that your statements could come in?" He answered, "No. No." Defense counsel tried again, asking whether, when he pled guilty, defendant hoped "to be able to go to another court and ask them to say that your statements would not be able to go in front of a jury?" He responded, "No, I didn't understand none of that." Counsel made several further attempts at the question. Defendant said he was just told to say yes, and he "didn't know what I was saying yes to."

On cross-examination by the prosecutor, defendant was asked whether he knew an offer had been made when he accepted it. He responded, "I said no. I said no, and she came out here and told my family tell me to take this deal. I told the lady in the back, no,

6

let's continue, go to trial, and some type of way I was told I was going to get life. So I didn't want to get life so I said yeah. Yeah, I remember taking 25, yeah." And again: "I was told I was going to lose the trial." Defendant said he did not know what "was really going on. I was just told to say yes, yes, yes. I didn't know what the question really meant." Asked whether he was threatened, defendant replied, "Man, I was under duress. I didn't know . . . I was forced to take it, yes." By whom? "That lawyer kept saying yes, looking at me saying yes, take it." Asked whether he was saying the lawyer threatened him, defendant answered "That's not how it came out of my mouth, sir . . . You can't force me to say something. I just told you I can't really say yes or no." Counsel then asked whether defendant's lawyer promised anything other than what was discussed on the record in court, and he replied, "No, she didn't tell me none of that. That's what she didn't do." He said his lawyer threatened him. Asked how, defendant answered that she said "yes, take it. Take it. Say yes. Say yes." She also advised his family to tell him to take the plea bargain, which they did.

Counsel then asked defendant whether, when he pled, he believed he had the right to appeal. Defendant interrupted the question with "no," then said he did not know what an appeal is; no one ever explained that the purpose of an appeal is to have a higher court consider things about the case. As to his signature on the declaration filed in support of the motion, he said "I never signed none of that" although it was his signature.

Asked the central question whether, when he pled he believed he could appeal anything about his case, defendant answered "no, no." Asked again whether he believed he could challenge the trial court's ruling in a higher court, defendant answered "No." It was only "later on after the plea bargain I was, but I was never—I was never told that before. Not, till later on, yeah. Later on I was; before, no." He explained that he never wanted the deal, and he "didn't know what was going on," he was afraid and nervous, and "didn't know what to do."

In ruling on the motion the trial court noted that there had been no discussion of a possible right to appeal during the taking of the plea; in fact the only matter discussed aside from the rights being waived and the actual waivers, was about placement of

defendant in the prison system, as to which the trial court had pointed out that it could not direct the prison authorities to make a particular placement, but that it would make a recommendation. During the plea colloquy defendant was given additional time to talk to counsel about the consequences of the plea and anything else, and he said he had no more questions for his attorney, the prosecutor, or the court. And at the present hearing he said he did not believe he could appeal denial of the suppression motion—he did not know he had such a right, which is understandable since he did not. Defendant's testimony that he was told to say "yes" to everything was not credible, since the transcript reflects that he did not say "yes" to everything; he answered "yes" to some things and said "no" to others. Summarizing, the court said the present motion appeared to be a kind of buyer's remorse. It denied the motion.

Defendant was later sentenced in accordance with the plea bargain. He filed a timely notice of appeal.


**DISCUSSION**

The decision whether to grant or deny a defendant's motion to withdraw a plea rests in the sound discretion of the trial court, and that court's decision is final absent abuse of discretion. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) Indeed, the defendant's burden on such a motion is to prove that an abuse occurred by clear and convincing evidence. (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456 and cases cited.) And the usual principle for appellate review of factual findings of a trial court applies here as well: the appellate court must accept the trial court's factual findings if they are supported by substantial evidence. "[A] reviewing court must adopt the trial court's factual findings if substantial evidence supports them." (*People v. Fairbank*, *supra*, at p. 1254.)

In this case defendant argues that he was misled into believing that he could appeal the adverse finding on his evidence suppression motion even though he subsequently pled no contest. He argues that his diminished mental abilities brought this case within "exceptional circumstances" which may justify withdrawal of the plea. He

8

cites *People v. Osmon* (1961) 195 Cal.App.2d 151, 154, for that proposition. *Osman* concerned waiver of the right to jury trial, and no case has been cited or found that applies such a broad proposition to a guilty plea, or its equivalent—a plea of no contest. But even if there were such an exception, this case would not fit within it.

Defendant argued he was misled into believing that his right to appeal would survive the guilty plea, but virtually no evidence was presented to support that claim. Although asked repeatedly during the evidentiary hearing, he never testified that his trial counsel, or anyone else, had told him that he could appeal the suppression ruling if he later pled guilty in a plea bargain.

On appeal, his attorney points to evidence at the suppression hearing with respect to defendant's impaired ability to understand the *Miranda* waiver. Each side presented an expert on this issue. Dr. Andrea Bernhard, a clinical psychologist, presented a declaration and testified for defendant. Based on her interview of defendant and the medical records, she did "not believe that [defendant] adequately understood *Miranda* [rights] and the consequences of waiving them."

The prosecution expert, Dr. Ronald Markman, a forensic psychiatrist, disagreed. He found no evidence of thought disorder. He explained, "You don't have to be a rocket scientist to understand *Miranda* warnings. You have to have a basic understanding of the import of what they mean and how you can relate to them and respond to those warnings, whether you choose to respond to questions or not. And in my opinion, he was capable of doing it when I examined him." Dr. Markman rendered a preliminary diagnosis of defendant as dull, with normal intellectual function. Defendant understood that he could choose not to answer questions and not to cooperate in questioning. Dr. Markman was aware that defendant previously had been found "mildly retarded" by the regional center, but "that was their diagnosis." Dr. Markman did not indicate agreement.

After hearing the evidence, the trial court found Dr. Markman "persuasive in his opinion based on his review, that the defendant did, at the time of the interview, understand the *Miranda* and intelligently and voluntarily chose to waive his *Miranda* rights . . . I do find that the People have proven by a preponderance of the evidence that

9

the waiver was knowing, intelligent and voluntary."

In summary, not only was there a failure of clear and convincing evidence that the trial court abused its discretion in denying defendant's motion to withdraw his plea, there is almost no credible evidence at all to justify a different result than the one reached by the court. As the trial court observed, defendant presented a case of buyer's remorse. It may be true that he was uneasy with the bargain he had made and it is natural that he would be nervous and ill at ease in the situation in which he found himself. But "[a]lthough ""[t]he criminal process . . . is replete with situations requiring the "making of difficult judgments" as to which course to follow . . . [and] . . . a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.""' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 368.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

10